UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:21-cv-00649-RJC-DCK

| PATRICE WILLIAMS, | ) |
| --- | --- |
| Plaintiff, | ) |
| v. | ) ORDER |
| CITY OF CHARLOTTE et al., | ) |
| Defendants. | ) |

**THIS MATTER** is before the Court on the Motions for Summary Judgment filed by Sergeant Brandon Ottelin, Officer Tiffany Anderson, and the City of Charlotte (Doc. Nos. 18, 19). Those officers and the City were sued by Patrice Williams after she was arrested early one morning in her apartment. Williams claims that the officers committed intentional torts and violated her constitutional rights when they entered her apartment to investigate a possible domestic dispute.

The Defendants are entitled to summary judgment because the officers' actions were justified at each step of their investigation. Exigent circumstances justified the officers' warrantless entry into Williams's apartment. Exigent circumstances also justified their attempt to temporarily detain Williams. And her arrest was justified because the officers had probable cause to believe that she had committed two offenses: unlawful resistance to the officers' efforts to detain her and an assault on Officer Anderson. For these reasons, as elaborated below, the Defendants' Motions for Summary Judgment are **GRANTED**.

I.  **BACKGROUND**[1]

At 3:51 in the morning on September 8, 2018, someone living in an apartment complex called 911 to report screams coming from a neighboring unit. Dispatch Records 1, Doc. No. 20, Ex. 1. The caller said that a woman was shouting "get of[f] me." *Id.* (capitalization omitted). A man had been "banging on the door" for ten minutes, shouting at the woman to "let him in." *Id.* The caller dialed 911 because she was "concerned" for the woman, who was "still . . . screaming." *Id.* The dispatcher received a general description of where the woman's apartment was located, *id.*, and first responders with the Charlotte Fire Department were dispatched at 3:53, arriving on the scene at 4:03, Fire Department Incident Report 1, Doc. No. 20, Ex. 2.

A second person called 911 at 4:09. Dispatch Records 2. That caller lived in unit 908, which was across from the screaming woman's apartment. *Id.* The caller reported that "a male [had been] beating a female for about the last 30–45 minutes." *Id.* (capitalization omitted). "[S]everal neighbors" told the firefighters who had arrived that "screams and noises" had been coming from unit 909. Fire Department Incident Report 1. The firefighters knocked on that apartment's door and on bedroom windows close to the door. *Id.* No one answered, though the firefighters glimpsed two individuals in the apartment. *Id.* The firefighters reported to dispatch that a domestic dispute could be in progress. Dispatch Records 1.

Sergeant Ottelin and Officer Anderson, officers of the Charlotte-Mecklenburg Police Department, arrived at 4:14. Dispatch Records 5. Sergeant Ottelin knew the details of the two 911 calls. Ottelin's Interview 4:18–38, Doc. No. 20, Ex. 9. While the officers walked up the stairs to unit 909, which was on the second floor, Sergeant Ottelin heard "banging and yelling coming from

---

[1] Largely because of the existence of emergency dispatch records and footage from the officers' body-worn cameras, there is no genuine dispute about the following material facts.

the area." Ottelin's Statement 1, Doc. No. 20, Ex. 6. And as the officers approached the apartment, they "heard a loud bang and felt the floor shake." *Id.*; *see* Anderson's Statement 1, Doc. No. 20, Ex. 7. Sergeant Ottelin briefly conferred with the on-scene firefighters, who said things were "quiet now." Ottelin Body-Worn Camera Footage 1:33–35, Doc. No. 20, Ex. 4. The officers walked up to the door, which was next to two bedroom windows. *Id.* 1:40–45. When Sergeant Ottelin knocked on the door, the bedroom's lights immediately went out. *Id.* 1:44–47. The officers could hear wails coming from inside the bedroom. *Id.* 1:45–2:09; Ottelin's Statement 1; Anderson's Interview 4:06–35, Doc. No. 20, Ex. 10. Sergeant Ottelin announced that police officers were present, and he asked the occupants to come to the door. Ottelin Body-Worn Camera Footage 1:45–2:09. No one came, though the wailing continued. *Id.*

After knocking and waiting for around twenty-five seconds, Sergeant Ottelin decided to breach the door and enter the apartment without a warrant. *Id.* Firefighters loudly banged on the door for about twenty-five seconds as they forced it open. *Id.* 2:29–55. Once the door was breached, the officers entered with weapons drawn, and Sergeant Ottelin shouted, "Police department! Show me your hands!" *Id.* 2:57–3:00. As the officers entered, they found Williams in the living room wearing only undergarments. *Id.* 2:59–3:03. With hands raised, she said, "There's only one person in here," and she asked, "What is going on?" *Id.* 3:01–03. Bypassing her, Sergeant Ottelin walked to the right, through the living room, and toward the bedroom whose windows were next to the front door. *Id.* 3:01–06. He thought "the disturbance" was "coming from" that bedroom. Ottelin's Statement 1. As he neared the bedroom's door, he saw that its handle had been damaged. Ottelin Body-Worn Camera Footage 3:04–07; Ottelin's Statement 1. Standing beside the door, he turned back to Officer Anderson and said, "Detain her." Ottelin Body-Worn Camera Footage 3:07.

At that, Williams exclaimed, "Detain me? No! I'm not being detained! No, I'm not!"

Ottelin Body-Worn Camera Footage 3:08–11. As Officer Anderson approached her, Williams protested, "I didn't do anything! I've been in my room!" *Id.* 3:13–15. Williams then started down a hall toward her room, which was on the officers' left as they entered. *Id.* 3:12–20. At the same time, Sergeant Ottelin opened the door to the bedroom he had walked to. Seeing a woman lying on a bed facing away from the door, he asked, "Ma'am, are you okay?" *Id.* 3:08–18. Only a wail was heard after he asked that question. *Id.* 3:18–19.

At that point, Officer Anderson was following Williams into her room, and their altercation had intensified into a shouting match. *Id.* 3:19–22. Sergeant Ottelin left the bedroom he was near and started for Williams's room, yelling, "Hold on a second!" *Id.* 3:19–24. Stopping outside the room, Sergeant Ottelin told Williams, "Come here now." *Id.* 3:24–30. Williams refused, shouting, "I don't know what she has going on! I am undressed! I'm not being detained!" *Id.* 3:32–36. As the two officers walked into Williams's room, Sergeant Ottelin told her, "Ma'am, you're going to be arrested. Turn around and put your hands behind your back." *Id.* 3:39–45. After Williams insisted, "I'm not going to be arrested," the situation devolved quickly. *Id.* 3:40–42. All three individuals shouted continuously as Officer Anderson reached for Williams and struggled to subdue her. *Id.* 3:45–50. Williams pushed back Officer Anderson's arms, and as Williams's resistance escalated, she shoved Officer Anderson, who fell onto a nearby bed. *Id.* 3:44–52. Sergeant Ottelin then grabbed and handcuffed Williams, who continued to shout. *Id.* 3:51–4:30; Ottelin's Statement 2.

Williams was charged with two crimes: resisting a public officer, *see* N.C. Gen. Stat. § 14 223, and assaulting an officer, *see id.* § 14-33(C)(4). Arrest Sheet, Doc. No. 20, Ex. 14. The charges were later dismissed. *Id.*; Ottelin's Interview 19:30–20:05.

4

## II. STANDARD OF REVIEW

A court will grant summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) ("Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."). A fact is material only if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). The moving party may carry its burden by showing "an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party must "set forth specific facts showing that there is a genuine issue for trial." *Id.* at 322 n.3. The nonmoving party may not rely on "the mere allegations or denials of [its] pleading" to defeat a motion for summary judgment. *Id.* Rather, the nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict" in its favor. *Anderson*, 477 U.S. at 248; *accord Sylvia Dev. Corp. v. Calvert Cnty.*, 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a motion for summary judgment, a court must view the evidence and any inferences from it in the light most favorable to the nonmoving party. *Sylvia*, 48 F.3d at 817. The mere argued existence of a factual dispute does not defeat an otherwise properly supported motion.

5

*Anderson*, 477 U.S. at 249. And if the nonmoving party's evidence is merely colorable, or is not significantly probative, summary judgment is appropriate. *Id.* at 249–50.

## III. DISCUSSION

Williams's Complaint is imprecise. It does not clearly articulate the types of claims she asserts, nor does it offer a legal theory for each claim. Nevertheless, for the sake of resolving the Defendants' motions, the Court assumes that Williams pleaded the claims below.

### A. § 1983 Claim

42 U.S.C. § 1983 allows individuals to "sue state and local officers for deprivations of constitutional rights." *Thompson v. Clark*, 142 S. Ct. 1332, 1336–37 (2022). Williams claims that Sergeant Ottelin and Officer Anderson violated her rights under the Fourth and Eighth Amendments (as made applicable to the States through the Fourteenth Amendment). Compl. ¶¶ 1, 8, 41, 44, 70, 73, Doc. No. 1-1.

Here, "there is no genuine dispute concerning the material facts—the officers' conduct—because [the Court is] able to establish the relevant conduct from the uncontroverted facts." *Cloaninger ex rel. Est. of Cloaninger v. McDevitt*, 555 F.3d 324, 332 (4th Cir. 2009). Since "[t]he officers' conduct is . . . established beyond genuine dispute," the "only remaining question is whether that conduct was objectively reasonable, which is a question of law, not fact." *Id.* at 333.

As explained below, the evidence, even when viewed in the light most favorable to Williams, "[w]ould not permit a reasonable jury to return a favorable verdict" for Williams on her § 1983 claim. *Sedar v. Reston Town Ctr. Prop., LLC*, 988 F.3d 756, 761 (4th Cir. 2021). Therefore, the Defendants are entitled to summary judgment. *Id.*; *see also Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) ("Where the record taken as a whole could not lead a rational trier of fact to find for

6

the nonmoving party, there is no genuine issue for trial.").[2]

### 1. Entry into Williams's Apartment

To protect the "right of the people to be secure in their persons, houses, papers, and effects," the Fourth Amendment prohibits "unreasonable searches and seizures." U.S. Const. amend. IV. An officer's entry into a person's home implicates the Fourth Amendment. *See Florida v. Jardines*, 569 U.S. 1, 5 (2013) ("When the Government obtains information by physically intruding on persons, houses, papers, or effects, a 'search' within the original meaning of the Fourth Amendment has undoubtedly occurred." (internal quotation marks omitted)).

Searches and seizures that occur "inside a home without a warrant" are "presumptively unreasonable." *Groh v. Ramirez*, 540 U.S. 551, 559 (2004). Still, "because the ultimate touchstone of the Fourth Amendment is 'reasonableness,' the warrant requirement is subject to certain exceptions." *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006). The exigent-circumstances exception allows officers to make a warrantless entry into a home when "the exigencies of the situation make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." *Mincey v. Arizona*, 437 U.S. 385, 394 (1978) (internal quotation marks omitted).

One exigency allowing for warrantless entry is "the need to assist persons who are seriously injured or threatened with such injury." *Brigham City*, 547 U.S. at 403; *see also United States v.*

---

[2] *See also, e.g.*, *Grayson v. Peed*, 195 F.3d 692 (4th Cir. 1999) (affirming grant of summary judgment on § 1983 claims that alleged excessive force and deliberate indifference to medical needs); *Prosise v. Haring*, 667 F.2d 1133, 1136 (4th Cir. 1981) (same, as to § 1983 excessive-force claim); *McCoy v. Robinson*, 133 F.3d 916, at *2 (4th Cir. 1998) (unpublished table decision) (same, as to § 1983 claim challenging detention and warrantless arrest); *Benson v. Vance Cnty. Sheriff*, 2006 WL 4821431, at *3–5 (E.D.N.C. Dec. 12, 2006) (same, as to § 1983 unreasonable-search claim).

*Moss*, 963 F.2d 673, 678 (4th Cir. 1992) (stating that, under the "emergency doctrine," a warrantless entry is constitutional if the officer had "an objectively reasonable belief that an emergency existed that required immediate entry to render assistance or prevent harm to persons or property within"); *Sutterfield v. City of Milwaukee*, 751 F.3d 542, 558 (7th Cir. 2014) (explaining that the Supreme Court in *Brigham City* effectively made the emergency doctrine a "subset" of the exigent-circumstances exception). Thus, under the exigent-circumstances exception, "police may enter a home without a warrant when they have an objectively reasonable basis for believing that an occupant is seriously injured or imminently threatened with such injury." *Brigham City*, 547 U.S. at 400.

The officers' warrantless entry into Williams's apartment was justified by exigent circumstances. Sergeant Ottelin and Officer Anderson had an objectively reasonable belief that an emergency—a violent domestic dispute—had just occurred or was ongoing. And they reasonably believed that this emergency required immediate entry to aid and protect the victim of the violence, whom they had reason to believe was suffering from or threatened with serious injury. Two different 911 callers, calling at around four o'clock in the morning, reported screams coming from a particular apartment. One caller said a woman was shouting "get of[f] me," and the other reported that "a male [had been] beating a female for about the last 30–45 minutes." Dispatch Records 1–2. When the officers arrived on the scene, they heard loud noises coming from the apartment. The lights inside the bedroom went out after they knocked on the door. When they announced who they were, nobody answered. And as they stood by the door, they heard wailing coming from inside. All of this combined to create "an objectively reasonable basis for believing . . . that [an] injured adult might need help." *Brigham City*, 547 U.S. at 406. And since the officers knew that a beating may have occurred (or could be imminent), they reasonably believed that a "serious[]"

8

injury had been inflicted or was forthcoming. *Id.* at 400. Accordingly, the officers' entry into the apartment was objectively reasonable and did not violate the Fourth Amendment. *See Georgia v. Randolph*, 547 U.S. 103, 118 (2006) ("[I]t would be silly to suggest that the police would commit a tort by entering . . . to determine whether violence (or threat of violence) has just occurred or is about to (or soon will) occur.").

2. Attempted Detention of Williams

"[J]ust as exigent circumstances permit a warrantless home entry, emergencies may justify a warrantless seizure in the home." *Armijo ex rel. Armijo Sanchez v. Peterson*, 601 F.3d 1065, 1073 (10th Cir. 2010). While *Terry v. Ohio*, 392 U.S. 1 (1968) normally governs investigative detentions, "*Terry* stops have no place in the home." *Id.* That is because of the "unique qualities of the home," which "prohibit seizures there without a warrant or exigent circumstances." *Cloaninger ex rel. Est. of Cloaninger v. McDevitt*, 555 F.3d 324, 334 (4th Cir. 2009); *see also Smith v. Jacko*, 2019 WL 4162376, at *9 (D.S.C. Sept. 3, 2019) ("Certainly, the usual rules pertaining to *Terry* stops do not apply in homes." (quoting *United States v. Martinez*, 406 F.3d 1160, 1165 (9th Cir. 2005))).[3]

Exigent circumstances justified the officers' attempts to temporarily detain Williams. First, the officers had a "reasonable articulable suspicion that [Williams] might be involved" in the domestic dispute. *Armijo*, 601 F.3d at 1074. At the time of entry, Williams and the then-unidentified person in the bedroom were the only two people the officers had reason to suspect

---

[3] Even if *Terry*'s standard for investigative detentions did apply, the officers satisfied it. "[V]iewed from the standpoint of an objectively reasonable police officer," Sergeant Ottelin and Officer Anderson had "a particularized and objective basis for suspecting" Williams of assaulting Brittany Collins, the wailing woman in the other room. *Navarette v. California*, 572 U.S. 393, 396, 402 (2014). The facts supporting that reasonable suspicion are discussed below.

9

were in the apartment, so the officers could have reasonably thought that one must be the attacker while the other was the victim. Since the handle to the bedroom door was damaged, the officers had a reasonable basis for suspecting that Williams (who was in the living room and clearly uninjured) had attacked the wailing person in the bedroom. Williams's misrepresentation that she was the only person in the apartment gave the officers another reason to suspect her. With this knowledge, and "focused on the emergency," the officers could have "detained [Williams] for the few minutes necessary to confirm or dispel their suspicions." *Id.* at 1073. Additionally, to "incapacitate the person suspected of [carrying out the assault], the officers needed to detain [Williams] while they investigated further." *Id.* at 1074. And because "the initial entry and brief search were based upon an emergency," the "[attempted] seizure did not stem from an ordinary investigation." *Id.* For these reasons, the officers' attempted seizure was "supported by exigent circumstances" and thus objectively reasonable under the Fourth Amendment. *Id.*[4]

3. Arrest of Williams

The Fourth Amendment "permits an officer to arrest a suspect without a warrant if there is probable cause to believe that the suspect has committed or is committing an offense." *Michigan v. DeFillippo*, 443 U.S. 31, 36 (1979). The existence of probable cause is assessed using "a 'totality-of-the-circumstances' approach." *Hupp v. Cook*, 931 F.3d 307, 318 (4th Cir. 2019) (quoting *Smith v. Munday*, 848 F.3d 248, 253 (4th Cir. 2017)). The inquiry "turns on two factors: the suspect's conduct as known to the officer, and the contours of the offense thought to be

---

[4] Even if Williams was "seized" at the moment the officers entered the apartment with their weapons drawn, *see Torres v. Madrid*, 141 S. Ct. 989, 995 (2021) (stating that a seizure can be caused by "*either* physical force . . . *or*, where that is absent, *submission* to the assertion of authority" (quoting *California v. Hodari D.*, 499 U.S. 621, 626 (1991))), that seizure was justified by the emergency's exigent circumstances.

10

committed by that conduct." *Id.* (quoting *Smith*, 848 F.3d at 253) (internal quotation marks omitted). While a court "look[s] to the information available to the officer on the scene at the time," it also "appl[ies] an objective test to determine whether a reasonably prudent officer with that information would have thought that probable cause existed for the arrest." *Id.* (citing *Graham v. Gagnon*, 831 F.3d 176, 185 (4th Cir. 2016)). There must be "sufficient evidence on which a reasonable officer at the time could have believed that probable cause existed for the arrest," though "[e]vidence sufficient to secure a conviction is not required." *Id.* (citing *Wong Sun v. United States*, 371 U.S. 471, 479 (1963)). While probable cause is "sufficient to effect a seizure," the "unique qualities of the home prohibit seizures there without a warrant or exigent circumstances." *Cloaninger*, 555 F.3d at 334.

As explained above, exigent circumstances were present as Sergeant Ottelin and Officer Anderson entered the apartment. The exigency existed at the time of Williams's arrest, for before then the officers had been unable to "detain[] [Williams] for the few minutes necessary to confirm or dispel their suspicions." *Armijo*, 601 F.3d at 1073. Nor had they yet been able to "incapacitate" Williams, the "person suspected of" carrying out the domestic assault. *Id.* at 1074.

Williams's arrest was also supported by probable cause. First, the officers had probable cause to believe that Williams had unlawfully resisted the officers' efforts to detain her. It is a crime to "willfully and unlawfully resist, delay or obstruct a public officer in discharging or attempting to discharge an official duty." N.C. Gen. Stat. § 14-223(a); *see also State v. Hoque*, 837 S.E.2d 464, 472 (N.C. Ct. App. 2020) ("The conduct proscribed under [§] 14-223 is not limited to resisting an arrest but includes any resistance, delay, or obstruction of an officer in the discharge of his duties." (quoting *State v. Lynch*, 380 S.E.2d 397, 398 (N.C. Ct. App. 1989))). The crime has five elements: (i) the "victim" must have been a public officer; (ii) the offender must

11

have "kn[own] or had reasonable grounds to believe" that the victim was a public officer; (iii) the officer must have been lawfully "discharging or attempting to discharge" a duty of his office; (iv) the offender must have "resisted, delayed, or obstructed" the officer in discharging or attempting to discharge his duty; and (v) the offender must have acted "willfully and unlawfully"—that is, "intentionally and without justification or excuse." *State v. Harper*, 877 S.E.2d 771, 776–77 (N.C. Ct. App. 2022) (quoting *State v. Peters*, 804 S.E.2d 811, 815 (N.C. Ct. App. 2017)).

Sergeant Ottelin and Officer Anderson had probable cause to believe that Williams's conduct satisfied these elements. They were performing their duties as police officers when they interacted with Williams. They were wearing uniforms, and Sergeant Ottelin had announced that they were police officers when they entered the apartment. As explained above, the officers' entry into the apartment was justified, and they were justified in attempting to temporarily detain Williams. While trying to detain her, the officers watched Williams walk away from them and then physically push them back. They listened as she shouted her refusal to be detained based only on her alleged, uninvestigated innocence. She persisted in this conduct for almost a minute and a half. *See* Ottelin Body-Worn Camera Footage 3:08–4:30. Observing all this, a reasonable officer would have concluded that probable cause existed to believe that Williams had unlawfully resisted the officers in violation of § 14-223(a).

Second, the officers had probable cause to believe that Williams assaulted Officer Anderson. It is a crime to "[a]ssault[] an officer or employee of the State or any political subdivision of the State . . . when the officer or employee is discharging or attempting to discharge [her] official duties." N.C. Gen. Stat. § 14-33(c)(4). "The essential elements of a charge of assault on a government official are: (1) an assault (2) on a government official (3) in the actual or attempted discharge of [her] duties." *State v. Noel*, 690 S.E.2d 10, 13 (N.C. Ct. App. 2010) (citing

12

*State v. Crouse*, 610 S.E.2d 454, 458 (N.C. Ct. App. 2005)). "There is no statutory definition of assault in North Carolina," so "the crime of assault is governed by common law rules." *State v. Mitchell*, 592 S.E.2d 543, 547 (N.C. 2004) (quoting *State v. Roberts*, 155 S.E.2d 303, 305 (N.C. 1967)). The common-law definition of "assault" is "an overt act or an attempt, or the unequivocal appearance of an attempt, with force and violence, to do some immediate physical injury to the person of another, which show of force or menace of violence must be sufficient to put a person of reasonable firmness in fear of immediate bodily harm." *Id.* (quoting *Roberts*, 155 S.E.2d at 305); *see also In re J.W.*, 2014 WL 6432916, at *3 (N.C. Ct. App. Nov. 18, 2014). To convict someone under § 14–33(c)(4), the State must "satisfy the jury from the evidence and beyond a reasonable doubt that the party assaulted was a law enforcement officer performing the duty of [her] office, and that the defendant knew [her] victim was a law enforcement officer." *State v. Rowland*, 283 S.E.2d 543, 546 (N.C. Ct. App. 1981); *see In re J.W.*, 2014 WL 6432916, at *3 & n.2.

The officers had probable cause to believe that Williams's conduct satisfied the three elements of § 14-33(c)(4)'s offense. First, the officers had probable cause to believe that Williams had committed an assault. When Williams forcefully shoved Officer Anderson, causing her to fall on the bed, Williams committed "an overt act" and "an attempt," with "force and violence," to "do some immediate physical injury to the person of [Officer Anderson]," which was "sufficient to put a person of reasonable firmness in fear of immediate bodily harm." *Mitchell*, 592 S.E.2d at 547. Second, Officer Anderson was "a government official." *Noel*, 690 S.E.2d at 13. And third, Officer Anderson was "in the . . . attempted discharge of [her] duties." *Id.* As explained above, Officer Anderson was justified in attempting to temporarily detain Williams. Further, the officers had probable cause to believe that Williams "knew [her] victim was a law enforcement officer." *Rowland*, 283 S.E.2d at 546. Officer Anderson was wearing her police uniform, and Sergeant

13

Ottelin (who was also uniformed) had announced that they were police officers when they entered the apartment.

Considering the totality of the circumstances, and judged from the objective perspective of a reasonable officer, Sergeant Ottelin and Officer Anderson had probable cause to believe that Williams had unlawfully resisted their efforts to detain her and had assaulted Officer Anderson in the process. Accordingly, Williams's arrest was objectively reasonable under the Fourth Amendment.

### 4. Excessive Force

Williams argues that the officers used excessive force. Compl. ¶ 44. Since the Fourth Amendment prohibits "unreasonable seizures," officers cannot use "excessive force" when arresting someone. *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (en banc). An officer's use of force is "analyzed under a standard of objective reasonableness." *Id.* (citing *Scott v. Harris*, 550 U.S. 372, 381 (2007)). A court must "focus on the moment that the force is employed" and determine "whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* (internal quotation marks omitted).

The officers' use of force was objectively reasonable. Williams physically resisted the officers' efforts to detain her for almost a minute and a half. *See* Ottelin Body-Worn Camera Footage 3:08–4:30. Throughout that time, Officer Anderson only reached out her hands to grab Williams. *Id.* Officer Anderson chose to holster the taser that she had initially drawn during her entry. *Id.*; Anderson's Statement 2. And when Williams shoved Officer Anderson to get out into the hallway, Sergeant Ottelin (who had also holstered his gun) had to stop Williams's movement by taking her to the ground. *Id.* 3:51–4:30; Ottelin's Statement 2. In short, the officers used the

14

minimal amount of force necessary to subdue Williams, and that amount of force was objectively reasonable under the circumstances.

5. Eighth Amendment

Williams claims that the officers violated her Eighth Amendment rights. Compl. ¶ 1. But "the Eighth Amendment's protections d[o] not attach until after conviction and sentence." *Graham v. Connor*, 490 U.S. 386, 392 n.6 (1989); *see also Ingraham v. Wright*, 430 U.S. 651, 671 n.40 (1977) ("Eighth Amendment scrutiny is appropriate only after the State has complied with the constitutional guarantees traditionally associated with criminal prosecutions."); *Knight v. Henrico Cnty. Police Dep't*, 2022 WL 10584523, at *3 (E.D. Va. Oct. 18, 2022) ("[T]he conduct of which Plaintiff complains occurred prior to any conviction, so the Eighth Amendment prohibition against cruel and unusual punishment does not apply."). Thus, Williams's Eighth Amendment claim fails.

6. The City's Liability

Williams asserts a § 1983 claim against the City of Charlotte, which operates the Charlotte-Mecklenburg Police Department. A municipality can be liable under § 1983 if it "follows a custom, policy, or practice by which local officials violate a plaintiff's constitutional rights." *Owens v. Balt. City State's Att'ys Off.*, 767 F.3d 379, 402 (4th Cir. 2014) (citing *Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 694 (1978)).

As explained above, Williams has not shown that any of her constitutional rights were violated. Accordingly, there is no basis for municipal liability under § 1983. *See Grayson v. Peed*, 195 F.3d 692, 697 (4th Cir. 1999) ("As there are no underlying constitutional violations by any individual, there can be no municipal liability."); *Haughie v. Wexford Health Sources, Inc.*, 2020 WL 1158568, at *16 (D. Md. Mar. 9, 2020) ("[B]efore determining whether a plaintiff has established a claim for municipal liability under *Monell*, the court must first 'determine whether

the complaint states a claim for a predicate constitutional violation.'" (quoting *Baker v. Dist. of Columbia*, 326 F.3d 1302, 1306 (D.C. Cir. 2003))).

B.     **State-Law Claims**

1.     Assault and Battery

Williams asserts a state-law claim against the officers for assault and battery. Compl. at 5. "[A] civil action for damages for assault and battery is available at common law against one who, for the accomplishment of a legitimate purpose, such as justifiable arrest, uses force which is excessive under the given circumstances." *Bartley v. City of High Point*, 873 S.E.2d 525, 535 (N.C. 2022); *see also id.* ("[O]ur General Statutes dictate that a law enforcement officer is justified in using force upon an individual when and to the extent that the officer reasonably believes it necessary to . . . effect an arrest of an individual who the officer reasonably believes has committed a criminal offense, unless the officer knows the arrest is unauthorized." (citing N.C. Gen. Stat. § 15A-401(d))).

As explained above, the officers' use of force was objectively reasonable and not excessive. Accordingly, Williams's assault-and-battery claim fails. *See Thomas v. Sellers*, 542 S.E.2d 283, 287 (N.C. Ct. App. 2001).

2.     False Imprisonment

Williams asserts a state-law claim against the officers for false imprisonment. Compl. at 5. "False imprisonment is the restraint of a person where the restraint is both unlawful and involuntary." *Wilkerson v. Duke Univ.*, 748 S.E.2d 154, 158 (N.C. Ct. App. 2013); *see also Bartley v. City of High Point*, 846 S.E.2d 750, 755 (N.C. Ct. App. 2020) ("False imprisonment is the illegal restraint of a person against his will. A restraint is illegal if not lawful or consented to. A false arrest is an arrest without legal authority and is one means of committing a false imprisonment."

16

(quoting *Lopp v. Anderson*, 795 S.E.2d 770, 779 (N.C. Ct. App. 2016))).

Because the officers "had probable cause to make the arrest," Williams's arrest was lawful, and her claim for false imprisonment fails. *Thomas*, 542 S.E.2d at 287.

### 3. Malicious Prosecution

Williams asserts a state-law claim against the officers for malicious prosecution. Compl. at 7. To prevail on such a claim, she must show that the officers (i) "instituted, procured or participated in the criminal proceeding against [her]," (ii) "without probable cause," (iii) "with malice," and that (iv) "the prior proceeding terminated in [her] favor." *Lopp*, 795 S.E.2d at 779.

Because the officers had probable cause to institute criminal proceedings against Williams, her malicious-prosecution claim fails.

### 4. Negligent Infliction of Emotional Distress

Williams asserts a state-law claim against the officers for the negligent infliction of emotional distress. That claim has three elements: (i) the defendants must have "negligently engaged in conduct"; (ii) it must have been "reasonably foreseeable that such conduct would cause the plaintiff severe emotional distress"; and (iii) the conduct must have "in fact cause[d] the plaintiff severe emotional distress." *Wilkerson*, 748 S.E.2d at 159 (quoting *Johnson v. Ruark Obstetrics & Gynecology Assocs., P.A.*, 395 S.E.2d 85, 97 (N.C. 1990)). In a "negligence action," police officers are "held to the standard of care that a reasonably prudent person would exercise in the discharge of official duties of a like nature under like circumstances." *Best v. Duke Univ.*, 448 S.E.2d 506, 511 (N.C. 1994).

There is no evidence that the officers acted negligently. They investigated the domestic dispute in an objectively reasonable manner, and "probable cause existed as a matter of law for plaintiff's arrest." *Best*, 448 S.E.2d at 512. Thus, Williams's claim for the negligent infliction of

17

emotional distress fails.

### 5. Intentional Infliction of Emotional Distress

Williams also asserts a state-law claim against the officers for the intentional infliction of emotional distress. Compl. at 10. To prevail on that claim, Williams must prove that the officers engaged in "extreme and outrageous conduct" that was "intended to cause and d[id] cause . . . severe emotional distress." *Wilkerson*, 748 S.E.2d at 159 (quoting *Dickens v. Puryear*, 276 S.E.2d 325, 335 (N.C. 1981)). Conduct is "extreme and outrageous" when it is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Smith-Price v. Charter Behav. Health Sys.*, 595 S.E.2d 778, 782 (N.C. Ct. App. 2004) (quoting *Briggs v. Rosenthal*, 327 S.E.2d 308, 311 (N.C. Ct. App. 1985)).

Williams has failed to produce any evidence that the officers engaged in extreme and outrageous conduct. They investigated the domestic dispute in an objectively reasonable manner and avoided excessive force. Lacking evidence of extreme and outrageous conduct, Williams's claim for the intentional infliction of emotional distress cannot succeed. *See McCoy v. Robinson*, 133 F.3d 916, at *3 (4th Cir. 1998) (unpublished table decision) (finding no evidence of extreme and outrageous conduct where an officer "arrested [the plaintiff] based on the reasonable belief that she had acted in violation of state law").

### 6. Claim Under the North Carolina Constitution

Williams asserts a claim under the North Carolina Constitution. Compl. at 9. Citing article I, sections 19 and 20 of the Constitution, Williams alleges that the officers' "unwarranted entry and arrest were without evidentiary support and in violation of [her] rights." Compl. ¶ 95. "However, when an adequate remedy in state law exists, constitutional claims must be dismissed."

*Wilkerson*, 748 S.E.2d at 159 (citing *Wilcox v. City of Asheville*, 730 S.E.2d 226, 236 (N.C. Ct. App. 2012)); *see also Corum v. Univ. of N.C.*, 413 S.E.2d 276, 289 (N.C. 1992) ("[I]n the absence of an adequate state remedy, one whose state constitutional rights have been abridged has a direct claim . . . under our Constitution."). For a remedy to be considered "adequate," a plaintiff must have "at least the opportunity to enter the courthouse doors and present [her] claim" and "the possibility of relief under the circumstances." *Wilkerson*, 748 S.E.2d at 159 (quoting *Craig v. New Hanover Cnty. Bd. of Educ.*, 678 S.E.2d 351, 355 (N.C. 2009)).

Here, Williams's "state constitutional claims are based upon the same alleged conduct that underlies [her] state law claims." *Id.* Because "state law gives [her] the opportunity to present [her] claims and provides the possibility of relief under the circumstances, [her] state constitutional claims must fail." *Id.* (internal quotation marks omitted).

       7.     <u>Punitive Damages</u>

Williams also requests punitive damages. Compl. at 11. But "punitive damages do not and cannot exist as an independent cause of action." *Hawkins v. Hawkins*, 400 S.E.2d 472, 474 (N.C. Ct. App. 1991). They are "mere incidents of the cause of action and can never constitute a basis for it." *Id.* Thus, if a party "has no cause of action independent of a supposed right to recover punitive damages," then she "has no cause of action at all." *Id.*

Since all of Williams's claims fail, she is not entitled to punitive damages.

19

## IV. CONCLUSION

**IT IS, THEREFORE, ORDERED** that the Motions for Summary Judgment filed by Sergeant Brandon Ottelin, Officer Tiffany Anderson, and the City of Charlotte (Doc. Nos. 18, 19) are **GRANTED**. The Clerk is directed to close this case.

Signed: May 23, 2023

Robert J. Conrad, Jr.
United States District Judge